Eladio MARTINEZ CHAVEZ, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 1085S426.

Supreme Court of Indiana.

March 1, 1989.

Susan K. Carpenter, Public Defender, M.E. Tuke, Hector L. Flores, Deputy Public Defenders, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

The principal question in this case is whether the trial court was justified in overriding the jury's recommendation against the death penalty.

Appellant Eladio Martinez Chavez and Reynaldo Rondon were tried before a jury and found guilty of murder, Ind.Code § 35–42–1–1(1) (Burns 1985 Repl.), and felony murder, Ind.Code § 35–42–1–1(2) (Burns 1985 Repl.). After the sentencing hearing, the jury recommended the death penalty for Rondon but not for Martinez Chavez. The trial court noted the jury's recommendation against the death penalty for Martinez Chavez but sentenced him to death anyway.

The evidence at trial established that Rondon's girlfriend, Eva Copeland, overheard a discussion in Spanish between Rondon and Martinez Chavez. She understood enough Spanish to surmise that the two men were planning to rob Francisco Alarcon. Copeland asked Rondon in English what he would do if Alarcon caught him. Rondon said he would kill him. Martinez Chavez said Rondon was "loco," meaning crazy.

Rondon arranged to have Everette Amiotte drive himself and Martinez Chavez to a place near Alarcon's house on the evening of October 10, 1984. Amiotte testified that he stayed in the car while Rondon and Martinez Chavez walked up the street and around the corner. About twenty minutes later Martinez Chavez returned alone. Amiotte said that Martinez Chavez looked nervous and smelled "like death." Martinez Chavez entered the car saying something in Spanish which Amiotte took to mean "stupid Reynaldo."

Amiotte drove away with Martinez Chavez and stopped at a gas station to buy cigarettes. While inside, Martinez Chavez spotted Rondon walking down the street. Rondon was carrying a windbreaker wrapped around a double-handled shopping bag. Rondon told the two men that the car he had been driving broke down and he led them to its location. The car was a green Pontiac which the State established belonged to Alarcon.

The next morning, Copeland saw Rondon riding his bike. She called to him and asked him where he had been the night before. Rondon became nervous. He handed two knives to her. She put them in her purse and later hid them in the trunk of her car.

That same day, the victim's next door neighbor noticed a number of suspicious circumstances, including the absence of Alarcon's car, and became concerned. When the neighbor tapped on the window of Alarcon's house and no one responded, he called the police. The police arrived and entered the house. In the living room, they saw that four pillows at one end of the couch had blood on them and that pieces from a brown glass bottle lay between the couch and the coffee table. The police observed a trail of blood leading to the bathroom. There they found the body of Alarcon; he had been stabbed fifteen times.

A search of Rondon's residence turned up a dark sock with blood-stained money in it and a shopping bag with more money and some jewelry. The bag also contained a bracelet inscribed with the name Frances Alarcon and military dog tags for Francisco Alarcon. Police also found the key to Alarcon's safety deposit box.

## I. *Overriding a Jury Recommendation*

An Indiana trial court need not accept the jury's recommendation either for or against the death penalty. The capital sentencing statute provides, "The court is not bound by the jury's recommendation." Ind.Code § 35-50-2-9 (Burns 1985 Repl.). The question in this case is the standard which must be met to justify overriding a jury's recommendation against death.

■ Our review of this question proceeds from the Indiana Constitution, which provides: "The Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." Ind.Const. Art. 7, § 4. In particular, this Court must review the imposition of a sentence of death to determine if the penalty is appropriate to the offender and his crime. *Van Cleave v. State* (1987), Ind., 517 N.E.2d 356, *cert. denied*, — U.S. —, 109 S.Ct. 819, 102 L.Ed.2d 808 (1989). Although the Indiana Rules for Appellate Review of Sentences say that a reviewing court will not revise a sentence unless no reasonable person could find such sentence appropriate, in a capital case, those rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." *Spranger v. State* (1986), Ind., 498 N.E.2d 931, 947 n. 2, *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987).

This Court has on one occasion affirmed a trial court's decision to override the jury's recommendation and impose the death penalty. *Schiro v. State* (1983), Ind., 451 N.E.2d 1047, *cert. denied*, 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699. In *Schiro*, the trial court had reason to believe that the jury had been tricked into recommending against the death penalty. The defendant had tried to delude the jurors into thinking he was mentally unstable by rocking back and forth in their presence.

451 N.E.2d at 1059.[1]  In this case, there is no evidence that Martinez Chavez misled the jury through his actions at trial or sentencing.  Thus, *Schiro* does not dispose of this case.

Thirty of the thirty-seven states that provide for the death penalty give the life-or-death decision solely to the jury.  Of the remaining seven states only Florida, Alabama and Indiana allow a judge to override a jury's recommendation against death. *Spaziano v. Florida*, 468 U.S. 447, 463 & n. 9, 104 S.Ct. 3154, 3164 & n. 9, 82 L.Ed.2d 340, 354 & n. 9 (1984).  The Florida Supreme Court has set the following standard:

> In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ.

*Tedder v. State*, 322 So.2d 908, 910 (Fla. 1975).  The Florida high court has not hesitated to reverse a trial court if it derogates the jury's role.  *See, e.g., Richardson v. State*, 437 So.2d 1091 (Fla.1983); *Cannady v. State*, 427 So.2d 723 (Fla.1983).  It has also affirmed a trial court's decision to override the jury's recommendation against death.  *E.g., Spaziano v. State*, 433 So.2d 508 (Fla.1983).

The United States Supreme Court has upheld the Florida Supreme Court's decision to impose the death penalty despite the jury's recommendation against it. *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).  The Court noted that the Florida Supreme Court applied a rigorous standard of review in such cases based upon *Tedder* and that that standard afforded capital defendants a "significant safeguard."  468 U.S. at 465,

104 S.Ct. at 3165, 82 L.Ed.2d at 356.  On another occasion, Justice Rehnquist termed the *Tedder* standard a "crucial protection" of Florida's capital punishment scheme. *Dobbert v. Florida*, 432 U.S. 282, 295, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344, 357–358 (1977).  Today we adopt a similar standard.[2]

The role of juries in Indiana's death penalty proceedings is a critical one.  While the General Assembly has authorized a trial court to override a jury's recommendation, consideration of the jury's recommendation cannot amount to a simple entry noting its existence.  *Williams v. State* (1988), Ind., 525 N.E.2d 1238.  This Court regards the recommendation of the jury as "a very valuable contribution to the process, in that it comes from a group representative of the defendant's peers, who are likely to reflect, collectively, the standards of the community."  *Brewer v. State* (1981), 275 Ind. 338, 373, 417 N.E.2d 889, 909, *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982).  The United States Supreme Court has recognized, "the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."  *Gregg v. Georgia*, 428 U.S. 153, 184, 96 S.Ct. 2909, 2930, 49 L.Ed.2d 859, 880–881 (1976).  Although the trial court is the final arbiter of the sentence, it is bound to make its decision on the same standards used by the jury, Ind.Code § 35-50-2-9(e), and it should heed the jury's recommendation.  The task today is to develop a standard appropriate to the separate roles of judge and jury.

**1.**  On Schiro's appeal from the denial of post-conviction relief, this Court held that the trial court could take into account its observations of the defendant in the courtroom, that those observations were germane to the court's consideration of the jury's recommendation, and that the observations were *not the sole basis for the trial court's decision* to impose the death penalty. *Schiro v. State* (1985), Ind., 479 N.E.2d 556, *cert. denied*, 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (1986).

**2.**  In Alabama, the only other state which allows a trial court to override the jury's recommendation against death, the Alabama Supreme Court has yet to formulate a distinct standard.  In such cases, the Alabama Supreme Court independently weighs the aggravating and mitigating circumstances to determine whether the death penalty was appropriate.  *E.g., Ex Parte Hays*, 518 So.2d 768 (Ala.1986), *cert. denied*, —— U.S. ——, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988).

The United States Supreme Court has declared that the discretion of the sentencing authority, whether judge or jury, must be limited and reviewable. *Spaziano*, 468 U.S. at 462, 104 S.Ct. at 3163, 82 L.Ed.2d at 354. Meaningful review by the state supreme court is an important safeguard to assure that imposition of the death penalty is not arbitrary or discriminatory,[3] regardless of whether the judge and the jury agree that death is appropriate or the judge overrides the jury's recommendation of life. *Id.* at 466, 104 S.Ct. at 3165, 82 L.Ed.2d at 356.

■ In order to sentence a defendant to death after the jury has recommended against death, the facts justifying a death sentence should be so clear and convincing that virtually no reasonable person could disagree that death was appropriate in light of the offender and his crime. A trial court cannot override the jury's recommendation unless the facts meet this standard.

■ None of the twelve jurors in this case had conscientious objections to the death penalty that would deter them from recommending it. *See* Ind.Code § 35-37-1-5 (Burns 1985 Repl.). The jury showed it was capable of recommending death because it found a death sentence appropriate for Rondon, the codefendant. The trial court made careful findings and did not lightly override the jury's recommendation, but it concluded that Rondon and Martinez Chavez were equally culpable.

The facts suggest that reasonable people could differ on the question of whether the death penalty was appropriate for Martinez Chavez. Most of the evidence implicated Rondon rather than Martinez Chavez. Rondon said he would kill Alarcon. He asked Amiotte to drive. He had the victim's dog tags, bracelet, and key to a safety deposit box together with a stash of blood-stained cash. He gave two knives to his girlfriend the morning after the murder. The evidence established Rondon, not

Martinez Chavez, as the leading personality.

■ While an accomplice may be found guilty of the crime largely executed by his principal, it does not follow that the same penalty is appropriate. Justice Frankfurter has written, "[T]here is no greater inequality than the equal treatment of unequals." *Dennis v. United States*, 339 U.S. 162, 184, 70 S.Ct. 519, 526, 94 L.Ed. 734, 749 (1949) (dissenting opinion). Because reasonable people could differ on the appropriateness of the death penalty for Martinez Chavez, the trial court should not have overridden the jury's recommendation.

## II. *Martinez Chavez's Conviction*

In addition to challenging the death penalty, Martinez Chavez appeals his conviction. He raises three issues:

A) Whether the trial court's failure to appoint an independent interpreter violated due process;

B) Whether the evidence is sufficient to support the convictions; and

C) Whether the trial court erred in denying separate voir dire of each prospective juror.

### A. *Right to Separate Interpreter*

Martinez Chavez understands little, if any, English. He presents a number of arguments based on the interpreters used to communicate with him.

■ *Police Questioning.* Martinez Chavez claims that failure to provide him with an unbiased interpreter during preliminary questioning violated his right against self-incrimination. He cites two cases in which this Court reversed convictions because the arresting police officer served as the translator at the guilty plea hearings. *Mislik v. State* (1915), 184 Ind. 72, 110 N.E. 551 (officer told defendant to say "I was there" even though defendant wanted to plead not guilty); *Bielich v. State* (1920), 189 Ind.

---

**3.** Justice Rehnquist has noted that the Florida Supreme Court had vacated 17 of the 38 death sentences it had reviewed up to 1977. *Dobbert*

*v. Florida*, 432 U.S. 282, 295 & n. 8, 97 S.Ct. 2290, 2299 & n. 8, 53 L.Ed.2d 344, 357 & n. 8 (1977).

127, 126 N.E. 220 (defendant did not intend to plead guilty).

When the police picked up Martinez Chavez for questioning, Officer Sam Rodriquez served as an interpreter. Officer Roger Szostek formulated questions in English which Rodriquez translated into Spanish. Rodriquez then translated Martinez Chavez's answer into English and Szostek typed up a statement in English. The officers had Martinez Chavez sign the statement and a waiver form in English.

At the suppression hearing, Martinez Chavez said he did not understand that he was waiving his rights. The trial court ruled that the statement could be used only for impeachment purposes. Martinez Chavez argues the ruling was wrong. Whether the ruling was right or wrong does not affect the validity of the conviction because the State used the statement only to impeach Martinez Chavez during the death penalty phase of the trial. If the trial court did err, the error did not affect the conviction.

*Joinder Hearing.* Martinez Chavez argues that the trial court erred by failing to provide simultaneous translation at the hearing on joinder. At that hearing Robert Hinojosa appeared as Martinez Chavez's interpreter, but he did not provide simultaneous translation. The trial court said, "It's not necessary to do the simultaneous translation as long as he's told what has occurred." Counsel then presented their legal arguments without calling any witnesses. During the hearing, the trial court directed Hinojosa to explain what the attorneys were arguing about. The trial judge said, "I want him to explain to the defendant that the motion we're here today for is to join his case with the trial of Reynaldo Rondon."

■ An indigent defendant who cannot speak or understand English has a right to have his proceedings simultaneously translated to allow for effective participation. *United States ex rel. Negron v. State of New York*, 434 F.2d 386 (2d Cir.1970). In *Negron*, the defendant never received the benefit of translation while the trial was in progress. The translator merely summa-

rized the testimony of the witnesses during two brief recesses throughout the entire four-day trial. *Id.* at 388. The Second Circuit found that this procedure denied the defendant's right of confrontation and endangered other rights. *Id.* at 389.

Eight years later Congress passed the Court Interpreters Act of 1978, 28 U.S.C. § 1827 (1978). Although the Act governs the use of interpreters only in the federal system, a recent case construing the Act is helpful in resolving Martinez Chavez's argument. The Ninth Circuit stated that while the Act generally requires the interpreter to be at the defendant's side continuously, its purposes were adequately met when the defendants had an interpreter at all times except on three occasions when the trial court "borrowed" the interpreter to assist a witness. *United States v. Lim*, 794 F.2d 469 (9th Cir.1986), *cert. denied*, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367.

■ The instant case is more similar to *Lim* than to *Negron*. While Martinez Chavez did not have continuous translation at the joinder hearing, he did have simultaneous translation at the other proceedings against him. At the brief joinder hearing where Martinez Chavez did not have simultaneous translation, the attorneys made legal arguments to the court without presenting any witnesses. Had the arguments been factual and required the testimony of witnesses, the procedures used at the joinder hearing might have implicated Martinez Chavez's right of confrontation and the other rights attendant to his presence in court. While simultaneous translation of the hearing would have been better, the trial court adequately protected Martinez Chavez's rights by directing the interpreter to tell him that the attorneys were arguing over whether his case should be joined with Rondon's.

*Translation at Trial.* Martinez Chavez challenges the translation procedure at trial. He argues that the trial court should have appointed an independent interpreter in addition to the court interpreter to facilitate communications with his attorney.

■ An interpreter enables a non-English speaking defendant to understand the trial, provides a means of communication between the defendant and his attorney, and translates the defendant's testimony if he testifies. *State v. Neave*, 117 Wis.2d 359, 362 n. 2, 344 N.W.2d 181, 183 n. 2 (1984). The interpreter is necessary to implement fundamental notions of due process such as the right to be present at trial, the right to confront one's accusers, and the right to counsel.

■ Abe Gomez served as the interpreter in this trial. All but one witness testified in English. Gomez sat behind Martinez Chavez and simultaneously translated the English testimony into Spanish. During the brief testimony of the Spanish-speaking witness, Gomez translated the testimony into English. At that time, of course, appellant did not need an interpreter. The trial court never allowed Gomez to take the stand for either party, although Gomez did attest to Officer Rodriquez's fluency in Spanish.

Martinez Chavez maintains the trial court should have appointed another interpreter in addition to Gomez. His argument focuses on the inability of a single translator to provide simultaneous translation of the proceedings and serve as an interpreter between him and his attorney. He cites two cases in support of this argument. Both cases are distinguishable.

In one case, the California Court of Appeals held that a defendant who does not speak English is effectively denied his right to an interpreter when his defense attorney must translate. *People v. Chavez*, 124 Cal.App.3d 215, 177 Cal.Rptr. 306 (1981) (construing state constitutional provision requiring an interpreter throughout the proceedings). The court reasoned that defense counsel could not cross-examine witnesses, listen attentively to testimony and make objections and at the same time render a complete and accurate translation for his clients. *Id.* at 226, 177 Cal.Rptr. at 313. This reasoning does not apply here because Martinez Chavez's counsel did not serve as both attorney and interpreter.

In the other case, the United States Supreme Court held that an indigent criminal defendant had the right to the assistance of an independent psychiatrist when the defendant's sanity was seriously in question. *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Martinez Chavez correctly notes that the Supreme Court ruled that a defendant had the right to consult a psychiatrist in preparation for presenting an insanity defense even though the trial court had already relied on a court-appointed psychiatrist to determine whether the defendant was competent to stand trial. He sees the right to an independent interpreter as an analogy.

The analogy is too tenuous. A psychiatrist provides the substance of the insanity defense and without an independent psychiatrist an indigent defendant would be deprived of the opportunity to prove his insanity. An interpreter merely translates words without adding anything of substance to the defense. *Ake* does not support the conclusion that the trial court should have appointed a separate interpreter for Martinez Chavez in addition to the translation Gomez provided.

At oral argument, Martinez Chavez's appellate counsel indicated that Martinez Chavez used Gomez to communicate with his counsel at recesses. Because Martinez Chavez communicated with his counsel through the interpreter at times other than during the trial, the translation arrangement did not deprive him of the right to counsel. The procedures used at trial afforded Martinez Chavez a fair trial in which he was meaningfully present, able to confront his accusers, and represented by counsel.

*Absence of Spanish Record.* The court reporter took down those portions of the proceedings that were in English but did not record the interpreter's simultaneous Spanish translation to Martinez Chavez. Martinez Chavez did not object at trial but claims on appeal that the trial court committed fundamental error by failing to provide an independent means of verifying the translation. He suggests that the simultaneous translation should have been taped

to allow review at a later time by someone who spoke Spanish.

This Court has held that the record of a post-conviction proceeding was complete even though the court reporter did not separately take down the Spanish words the interpreter translated into English. *Garcia v. State* (1979), 271 Ind. 209, 391 N.E.2d 604, *cert. denied*, 444 U.S. 901, 100 S.Ct. 212, 62 L.Ed.2d 137. One factor in the *Garcia* decision was the presence of the petitioner's priest who spoke Spanish and confirmed that the translation was accurate and correct. *Id.* at 212, 391 N.E.2d at 606. Although the record contained only the English translation and not the petitioner's answers in Spanish, the Court ruled that the petitioner knowingly and voluntarily pled guilty.

A criminal defendant is denied due process when the accuracy and scope of a translation at a hearing or trial is subject to grave doubt. *United States v. Cirrincione*, 780 F.2d 620 (7th Cir.1985). The interpreter in this case took an oath to translate truly, and appellant presents no evidence to suggest that the interpreter violated his oath. Although an independent interpreter did not corroborate Gomez's translation, as the priest did in *Garcia*, there is no indication that the interpretation is subject to grave doubt.

### B. *Sufficiency of Evidence*

Appellant argues that the evidence is insufficient to support his convictions. He challenges the credibility of two witnesses who implicated him in the crime.

In reviewing sufficiency of the evidence, this Court will not reweigh the evidence nor judge the credibility of the witnesses to determine whether the evidence supports the conclusion that the defendant was guilty beyond a reasonable doubt. *Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260, *cert. denied*, 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105.

Rondon's girlfriend overheard Rondon and Martinez Chavez discuss a plan to rob the victim. Pursuant to this plan, Amiotte drove the two men to a location near the victim's house on the night of the murder. Amiotte let the two men out and about twenty minutes later Martinez Chavez returned. Later, Amiotte saw Rondon with a shopping bag that contained items from the victim's house. The jury could reasonably infer that appellant participated in the robbery.

A person who aids another person to commit an offense commits the offense. Ind.Code § 35–41–2–4 (Burns 1985 Repl.). A person may be convicted of felony murder even though it was his accomplice who killed the victim. *Richardson v. State* (1985), Ind., 476 N.E.2d 497. In proving a felony murder charge, the State need only show that the defendant intended to commit the underlying felony; it need not establish intent to kill. *Head v. State* (1982), Ind., 443 N.E.2d 44.

Appellant's argument regarding the credibility of Amiotte and Copeland was before the jury. The jury still found Martinez Chavez guilty. The evidence was sufficient to support the conviction for felony murder.

### C. *Individual Voir Dire*

Martinez Chavez claims the trial court erred by denying individual voir dire in his death penalty case. The trial court did allow individual voir dire of those prospective jurors who were familiar with the crime from news reports, but it conducted group voir dire of the rest.

Appellant acknowledges the Court has decided this issue adverse to his claim. *Burris v. State* (1984), Ind., 465 N.E.2d 171, *cert. denied*, 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985). Nevertheless, he urges the Court to reconsider its previous holdings and find that the trial court abused its discretion because he is a Mariel Cuban. This does not distinguish his situation from other cases presented and decided to the contrary. *E.g., Wisehart v. State* (1985), Ind., 484 N.E.2d 949, *cert. denied*, 476 U.S. 1189, 106 S.Ct. 2929, 91 L.Ed.2d 556 (1986); *Lowery v. State* (1985), Ind., 478 N.E.2d 1214, *cert. denied*, 475 U.S. 1098, 106 S.Ct. 1500, 89 L.Ed.2d 900 (1986). Martinez Chavez presents no error on this issue.

### III. *Two Convictions Merge*

Although Martinez Chavez does not raise the issue, it is apparent that one of the convictions must be vacated. In Count I, the State charged Martinez Chavez with murder. In Count II, it charged him with felony murder. Because only one murder occurred, Martinez Chavez cannot be sentenced on both convictions. *Sandlin v. State* (1984), Ind., 461 N.E.2d 1116. The conviction for murder merges with the conviction for felony murder. The trial court is directed to vacate the former.

The death sentence is vacated and the cause remanded to the trial court for sentencing to a term of years on the felony murder conviction.

DeBRULER, GIVAN and DICKSON, JJ., concur.

PIVARNIK, Justice, concurring and dissenting.

While I concur in Issue II of the majority opinion, I must dissent to the conclusions reached by the majority in Issue I concerning the trial court's overriding of the jury's recommendation against the death penalty. This issue is not new to this court nor has it failed to visit itself upon the various jurisdictions throughout this country, culminating in the United States Supreme Court resolution in *Spaziano v. Florida* (1984), 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340.

The majority proposes to establish a new standard which would hold that before a judge could override a jury verdict against death, the facts justifying a death sentence should be so clear and convincing that virtually no reasonable person could disagree that death was appropriate in light of the offender's character and his crime. Actually this is a standard to which this court adheres in reviewing any sentence, particularly where the sentence imposed is increased from the basic statutory term because of a finding of aggravating circumstances. The majority then finds the facts of this case indicate reasonable people could differ on the appropriateness of the death penalty for Martinez Chavez. I fail to find support for this conclusion. I detect that the majority is saying the jury was composed of reasonable people who made a determination, the judge was a reasonable person, and that they disagreed, and therefore reasonable people could differ. Obviously, if this logic is applied, there would be no case in which a judge could override a jury even though the law clearly provides for it.

In truth, the test to be applied where a trial judge imposes a death sentence is based on the determination that the judge entered written findings according to his independent review of the evidence, and from which he finds aggravating circumstances justifying the death penalty under the law. These aggravating circumstances must overcome any mitigating circumstances and demonstrate the result was not irrational or arbitrary. This is true whether the jury recommends death or against death. This is true because the judge is the ultimate sentencer regardless of what the jury recommends. At the risk of being repetitious, I emphasize that the trial judge must do these things even if the jury recommends death because a death penalty cannot be imposed except by the trial judge.

The judge in the instant case made lengthy findings which were supported by the evidence. He found that the evidence clearly showed Martinez Chavez was equally responsible for the intentional killing of Francisco Alarcon while committing the crime of robbery. He found there was an agreement between Rondon and Martinez Chavez to rob Alarcon with the understanding there might be a need to kill Alarcon if he resisted. He found the Alarcon home was a small bungalow, that there were signs of violence demonstrated by broken glass and bloodstains in every room of the house, and that both Rondon and Martinez Chavez were in the home for some time. He found it would have been impossible for Martinez Chavez to have been merely a bystander under the circumstances as described. The trial court further pointed out that Martinez Chavez was the only occupant of the back seat of the car used to leave the scene and that the

back seat was blood stained after the murder. The trial judge concluded the intentional murder in perpetration of a robbery was a joint enterprise between Martinez Chavez and Rondon, that they were equally culpable, and it would be an injustice for both not to be treated equally.

The evidence supports the trial court's findings. The question is not which of the defendants was more culpable, but how culpable was Martinez Chavez. In *Spaziano*, 468 U.S. at 467, 104 S.Ct. at 3166, 82 L.Ed.2d at 357, Justice Blackmun reasoned: "Whether or not 'reasonable people' could differ over the result here, we see nothing irrational or arbitrary about the imposition of the death penalty in this case." Again, Justice Blackmun stated: "Our responsibility, however, is not to second-guess the deference accorded the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory." *Id.* at 465, 104 S.Ct. at 3165, 82 L.Ed.2d at 356. This is the test to be applied in a review of the death penalty or, as a matter of fact, any sentence a trial court imposes. This court has set standards to be applied in making this determination in virtually hundreds of cases, some of which the majority refers to and cites. The trial judge in this case is a very experienced criminal judge. He has made his findings in writing that comport with the law and are supported by the evidence. I would affirm his judgment in all respects.