Thomas SCHIRO, Petitioner,

v.

Richard CLARK, and Indiana Attorney General, Respondents.

Civ. No. S83–588.

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 26, 1990.

Alex Voils, Indianapolis, Ind., for petitioner.

David A. Arthur, Deputy Atty. Gen., Indianapolis, Ind., for respondents.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

On December 28, 1983, this petitioner, Thomas Schiro, filed the within petition seeking relief under 28 U.S.C. § 2254. This case has been pending since and counsel has been appointed for this petitioner. The full state court record consisting of eight (8) volumes has been filed and examined pursuant to the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). Numerous proceeding have been held, the most recent one an oral argument in Lafayette, Indiana on November 8, 1990.

This petitioner, Thomas Nicholas Schiro, was convicted of murder while committing or attempting to commit rape in the Brown Circuit Court, at Nashville, Indiana, on or about September 12, 1981. Although the jury in a bifurcated death penalty proceeding did not recommend the death penalty, the Honorable Samuel R. Rosen, the Judge of that court, imposed the death penalty on this petitioner on October 2, 1981.

On direct appeal to the Supreme Court of Indiana, the aforesaid conviction was affirmed in *Schiro v. State,* 451 N.E.2d 1047 (Ind.1983), *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699 (1983).

An amended petition for post-conviction relief was filed in the Brown Circuit Court on May 11, 1984, and was heard by the Honorable James M. Dixon acting as special Judge. Judge Dixon denied that petition for post-conviction relief after a hearing on May 29, 1984, and the Supreme Court of Indiana affirmed the denial of post-conviction relief as reported in *Schiro v. State.,* 479 N.E.2d 556 (Ind.1985), *cert. denied,* 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (1986) (Brennan and Marshall, J., dissenting).

When the second appeal got to the Supreme Court of Indiana in *Schiro v. State,* 479 N.E.2d 556 (1985), Justice Prentice concurred in the denial of post-conviction relief and in the opinion authored by Chief Justice Givan thereon. Only Justice DeBruler dissented, citing *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), *Mullane v. Central Hanover Bank and Trust Company,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), and *Armstrong v. Manzo,* 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). A further petition for post-conviction relief was filed in the state court. Special Judge John Baker of Bloomington, Indiana, now a judge on the Court of Appeals of Indiana, heard that petition and denied same which was appealed to the Supreme Court of Indiana, which affirmed the decision of Judge Baker in *Schiro v. State,* 533 N.E.2d 1201 (Ind.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 268, 107 L.Ed.2d 218 (1989). In that appeal, the Supreme Court, speaking through Justice Pivarnik, denied claims of ineffective assistance of counsel made under the Indiana Post–Conviction Remedy Rule, and Justice DeBruler again dissented, primarily on the ground that the recommendation of the jury was an acquittal, triggering the protections of the double jeopardy clause. In this effort, he picked up the concurring vote of Justice Dickson.

Numerous proceedings have been held in this case, including a final oral argument in Lafayette, Indiana, on November 8, 1990, and this petitioner has had the benefit of able and experienced appointed counsel throughout these proceedings. An amended petition seeking relief under 28 U.S.C. § 2254 was filed here August 19, 1986, and that petition and the return addressing it form the issues to be decided by this court.

It is basic and elementary that this court is here engaged in collateral review which must focus only on constitutional issues properly raised and exhausted. *See Bell v. Duckworth,* 861 F.2d 169 (7th Cir.1988), *cert. denied,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). There is nothing conceptual with reference to cases in which the death penalty is imposed that changes the basic scope of this court's collateral constitutional review under § 2254. As a matter of reality, it is to be noted that a good number of steps have been taken by the Court of Appeals in this circuit to insure that this variety of federal habeas review is done in a most careful fashion. In this vein, this court has made a full independent review of all of the state

record under *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

It is also basic that this court does not act as a general court of common law review, but acts under a specific federal statute that limits its consideration to errors properly preserved and exhausted that are of a constitutional dimension. The Supreme Court of Indiana, in the direct appeal of this case in *Schiro v. State*, 451 N.E.2d 1047, the basic facts are stated as follows:

The evidence most favorable to the State reveals that the body of Laura Luebbehusen was discovered in her Evansville home on the morning of February 5, 1981. Laura's roommate, Darlene Hooper, and Darlene's ex-husband, Michael Hooper, discovered the body. Darlene had spent the previous night at Michael's apartment. The two found the home in great disarray, with blood covering the walls and floor. Laura's body was found near the door, her legs spread apart, and her slacks were pulled down around her ankles. The police were called and recovered a large broken vodka bottle, a handle and metal portions of an iron, a partially consumed bottle of wine, a pint bottle of vodka, and empty alcoholic beverage cans and bottles in the garbage.

Dr. Albert Venables testified as the pathologist who performed the autopsy on the victim. Dr. Venables found a number of contusions on the body but he stated that Laura Luebbehusen had been strangled to death. A number of wedge-shaped injuries on the head were most likely caused by a blunt instrument. Dr. Venables also found lacerations on the nipple and a thigh, and a tear in the vagina, all caused after the victim's death. A forensic dentist confirmed that the injury to the thigh was a human bite mark.

A few days after Laura Luebbehusen's body was discovered, her Toyota automobile was found about one block away from the Second Chance Halfway House. Defendant Schiro was a resident at the Halfway House, which tried to assist former criminals in finding employment and remove any obstacles that they face when released from prison. It also housed people who were sent there for treatment and counseling in lieu of sending them to prison from the local courts.

The director of the Halfway House, Ken Hood, asked a counselor to check the sign-in and sign-out sheets to see if any of the residents had been out at the time of the Luebbehusen murder. While the counselor was examining the sign-out sheets, Schiro approached him and asked if he could talk about something that was very "heavy." The counselor told Schiro to speak to Ken Hood. Schiro admitted to Hood that he had killed Laura Luebbehusen. Hood contacted the police and took Schiro down to the station.

Jimmy Wolff was Schiro's roommate at the Halfway House. Wolff testified that Schiro arrived at the room about 5:00 a.m. on February 5, 1981, the day Laura Luebbehusen's body was found. Schiro told Wolff he had to go downstairs and straighten things out so he would not get in trouble about being out all night.

After Schiro confessed to Ken Hood, the police searched his room and determined that the blood on a jacket found in the room was consistent with that of the victim, but not consistent with Schiro's blood. While in a holding cell in Vanderburgh County Jail, Schiro told another inmate that he had been drinking and taking Quaaludes the night of the killing, and had intercourse with the victim before and after killing her.

Mary T. Lee, Schiro's girlfriend, testified that shortly after the murder was committed, Schiro visited her in Vincennes and admitted that he killed Laura Luebbehusen. Schiro told Lee that he gained entrance to the victim's home on the pretext that his car had broken down. After pretending to use the telephone to call for assistance, Schiro asked if he could use the bathroom. He came out of the bathroom exposed but told Laura not to be alarmed because he was "gay." This story Schiro made up in order to gain the victim's confidence. Schiro fur-

ther told Luebbehusen that some "gay" friends had bet him that he could not "get it on" with a woman and he just wanted to win the bet. Schiro and Luebbehusen talked about homosexuality and Luebbehusen told Schiro that she, too, was "gay." Darlene Hooper, Luebbehusen's roommate, had testified earlier that Laura was a practicing lesbian and that she had an aversion to men.

Schiro roamed through the house and came back with two dildoes and had Laura Luebbehusen try to insert one into his anus. He found the experience too painful and told Luebbehusen he would make love to her instead. A dildo, identified at trial as the one taken from the house, was recovered in Vincennes. Mary Lee told the police where Schiro had disposed of it after showing it to her. After intercourse, Luebbehusen tried to leave but Schiro stopped her, dragged her back into the bedroom, and raped her. During this time the two had been drinking. When the liquor ran out, they left to go buy more and returned to the house. Schiro fell asleep but woke up when Luebbehusen again attempted to leave. Schiro forced her to remain and she fell asleep on the bed. While Luebbehusen slept, Schiro felt the urge to kill her, grabbed the vodka bottle and beat her on the head until the bottle broke. He then beat her with the iron and when she resisted his attack, finally strangled her to death. Schiro then dragged Luebbehusen into another room, undressed her, and sexually assaulted the corpse.

*Schiro*, 451 N.E.2d at 1049–1050.

■ An issue was raised with regard to the so-called proportionality. The validity of any such issue in this case appears to have been laid aside by the Supreme Court of the United States in *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), and reaffirmed in *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). The issue also appears to have emerged in regard to the double jeopardy clause of the Fifth Amendment of the Constitution for the United States, as made applicable to the states under the Fourteenth Amendment. The complaint

seems to be that somehow the double jeopardy clause of the Fifth Amendment was violated. For a discussion of that clause recently by this court, see *United States v. Crumpler*, 636 F.Supp. 396 (N.D.Ind.1986). *See also Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). This argument seems to spring from the action of the Supreme Court of Indiana when by order of February 11, 1983, it remanded to the Brown Circuit Court for a written entry reflecting the reasons for this death sentence. Somehow it is contended that this action violates the Double Jeopardy Clause. Even more far-fetched is the argument that somehow this petitioner had the right to be present when the Brown Circuit Court entered its written findings on that remand. He had no more right to be present then than he had a right to be present when the justices of the Supreme Court conferred on his case.

■ In any event, it appears that *United States v. Cosentino*, 869 F.2d 301, 309 (7th Cir.1989), has answered that double jeopardy question adverse to this petitioner. Where a new entry was made on the basis of evidence already in the record, there is neither a constitutional right to be present when that formal entry is made by the state trial judge nor is the double jeopardy clause violated, the practice of appellate courts in remanding cases for more explicit findings is commonplace in both criminal and civil appeals. The Supreme Court of the United States has upheld a death sentence entered pursuant to a remand even when there is a deficiency in the first sentence. *See Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986). It does not appear in this case that this remand was because of insufficient evidence, but it was designed to give the Supreme Court of Indiana a more explicit statement of the reasons for this death sentence. Such is altogether proper action by the Supreme Court of Indiana. *See Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1989). The Supreme Court has also dealt with the double jeopardy concept where there is a new sentencing

hearing in *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).

Certainly, if a new hearing can be constitutionally held, the Supreme Court of Indiana is well within its authority to request a more explicit written finding from the sentencing trial judge on the basis of the evidence already presented. Certainly, the double jeopardy clause of the Fifth Amendment of the Constitution of the United States does not inhibit that process. Neither is the confrontation clause of the Sixth Amendment of the Constitution of the United States violated in such a situation. *See Kentucky v. Stincer*, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987).

A far more fundamental concern is the simple fact that the jury recommended against the death penalty and Judge Rosen chose to impose one. The Indiana statute permits that to happen and that statute on its face passes constitutional muster. In this regard, it is necessary to here set out the statement of Judge Rosen:

## PRONOUNCEMENT OF SENTENCE

The Defendant, having been found guilty by a jury on the 12th day of September, 1981, and the Court having entered judgment of conviction of the crime Murder/Rape, and on September 15, 1981, the Court having heard arguments by Jerry Atkinson, Deputy Prosecuting Attorney for the State of Indiana, and Michael Keating, for the Defendant, and both the State and counsel for Defendant having moved to incorporate the evidence of the trial, which motion was granted by the Court, and the jury having returned their unanimous recommendation to the Court that the death penalty not be imposed on the Defendant, and the Court having reviewed the evidence of the trial thereafter, and having considered the written presentence report, gives the following reasons for the imposition of the sentence: The jury in its verdict of guilty of Murder/Rape, rejected the plea of insanity. The testimony of the Court appointed Psychiatrists, Charles H. Crudden, M.D., and Bernard R. Woods, M.D., both indicated that the Defendant is in good contact with reality and is not psychotic or insane. His conversations were relevant and coherent, with a good understanding of the charges against him and the possible consequences of these charges, as well as an understanding of the roles of the defense attorney, the prosecuting attorney, the jury and the Judge. Their prognosis for the Defendant is very poor and they concluded that this Defendant is now and will be a dangerous person in the community. David Crane, M.D., the attorney and psychiatrist, indicated that from a review of the autobiographical statement by the Defendant submitted into evidence by the Defendant's attorney, which indicated that Defendant had committed numerous rapes and acts of criminal deviate conduct, is a dangerous person, but like the Court appointed psychiatrists, found the Defendant to be sane at the time of the offense. The Defendant's own witness, a psychologist, Dr. Frank Osanka, indicated that the Defendant is 'overpowered by the need for erotic release.' Mary T. Lee, with whom the Defendant had lived, testified to vicious sadistic assaults on her infant under the age of two years, by immersing the said infant under water until the child stopped breathing and then resuscitating the infant. Mary T. Lee also testified that he had knocked out her front teeth with his fist. Linda Gail Summerford, a witness for the State, testified at length of a violent rape committed by the Defendant, in the presence of her child, a victim of cerebral palsy, and under threat of harm to said child. In her testimony she identified the Defendant, and Defendant's counsel had no questions and made no objections to her testimony. At no time has the Defendant indicated any remorse. These are aggravating circumstances.

The fact that the Defendant committed these crimes with gruesome, sadistic acts, including necrophilia, but nevertheless wore gloves so that there would be no trace of fingerprints, and transported said gloves to his girlfriend, Mary T. Lee, for disposal, as he had likewise trans-

ported the dildo to Vincennes to be thrown in a waste barrel behind a bar, indicated the Defendant's thoughtful planning to escape being caught. This is an aggravating circumstance.

The Defendant had been previously convicted of robbery, a class C felony, in Vanderburgh County, and was on work release when arrested for this crime. This is an aggravating circumstance.

This Court personally observed the Defendant, while the jury was present, making continual rocking motions, which did not stop throughout the trial, *except* when the jury left the courtroom. In the Court's outer chambers, out of the presence of the jury, in the eight days of trial, the Court frequently observed the Defendant sitting calmly and not rocking. It is apparent to the Court that this may well have influenced the jury in its recommendation.

The age of the Defendant is twenty years. This is not a mitigating circumstance, nor was the age of the victim, twenty-eight years, a mitigating circumstance.

For all of the above reasons, the Court now sentences the Defendant to death. The sentence is required by the Statutes of the State of Indiana, as all of the aggravating circumstances listed herein by far outweigh any mitigating circumstances.

The Court has no choice but to follow the law.

The Defendant is to be executed as by law provided on the 28th day of January, 1982, before sunrise.

The Defendant is remanded to the custody of the Sheriff.

The petitioner through his counsel has been given the rare opportunity to have some sworn testimony by the sentencing judge which was elicited in post-conviction proceedings in the state court. One would hope that that does not become a regular tactic. A sentencing judge who imposes a death sentence has enough to worry about and should not be put on trial after the fact. It does not appear to this court to be necessary that a sentencing judge himself be put on trial and under oath before yet another judge to explain any sentence, including the death penalty. That is in the opinion of this Judge, not a very good way to properly manage the relationship between a trial judge and litigants and a trial judge and a reviewing appellate court. The procedure really creates many more problems than it solves, and such is the case here.

On the sentencing process, a presentence report was made available to this petitioner and his counsel which contained a mass of information, including an admission by the petitioner that he tried to manipulate people. An opportunity was provided to the petitioner and his counsel to comment on or object to the contents of that presentencing report. In fact, such a pleading was filed with reference to statements of a Dr. Crane. There is certainly evidence of the manipulative aspect of this petitioner's personality before the sentencing trial court.

■ A double jeopardy argument is made with reference to the recommendation of the jury vis-a-vis the sentence of the trial judge. It is argued that the first judgment of the jury should preclude or bar a second judgment of the trial judge. However, the Indiana death penalty statute in Indiana Code § 35–50–2–9 places the sentencing function on the trial judge. A copy of the death penalty statute is marked Appendix "A" and attached hereto. The Supreme Court of the United States has specifically found that there is no constitutional requirement for so-called jury sentencing. *See Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). The Supreme Court of Indiana made the same decision in the first direct appeal at 451 N.E.2d at 1055. The so-called verdict of the jury in both Florida and Indiana are advisory. The same is also true in Alabama and the Supreme Court of the United States dealt with that statute in *Baldwin v. Alabama,* 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). In *Baldwin,* 472 U.S. at 372, 105 S.Ct. at 2728, the complaint was that the sentencing judge gave too much consideration to the jury's recommendation. However, the Supreme

Court of the United States directly answered the constitutional question here posed in *Spaziano,* 468 U.S. at 447, 104 S.Ct. at 3155. Paralleling that conclusion, the Supreme Court of Indiana was constitutionally correct in its ruling on the direct appeal in 1983.

In his concurring and dissenting opinion at 451 N.E.2d at 1064, Justice DeBruler details the argument that the recommendation of the jury against the imposition of the death penalty is in fact a "verdict" that invokes the double jeopardy clause of the Fifth Amendment of the Constitution of the United States as the same is incorporated into the Fourteenth Amendment. The argument is comprehensively and well-stated but most respectfully, that argument has been categorically rejected by a majority in the Supreme Court of Indiana. In his concurring and dissenting opinion, Justice Prentice parallels the argument made by Justice DeBruler and adds a number of points that find their foundation primarily in state law.

The mandate in Indiana appears to be that a sentencing trial judge in imposing the death penalty must find by clear and convincing evidence reasons for declining to follow the jury's recommendation. *See Martinez Chavez v. State,* 534 N.E.2d 731 (Ind.1989). An argument is made along the way that Judge Rosen considered the Indiana statute to mandate rather than allow the death penalty. That is not a correct reading of the Indiana statutes and there is nothing in this record to indicate that Judge Rosen finally had that understanding of the statute. Judge Rosen obviously felt very strongly that based on the record and the case which he had seen and heard, the death penalty *should* be imposed.

■ In the trial itself on the merits, there is a claim that the state trial judge erred constitutionally in the admission of incriminatory statements made by the director of the work release program in which Schiro was serving a sentence at the time of the murder. It is contended that the admissions thereof were in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.

1602, 16 L.Ed.2d 694 (1966). Those statements were not in violation of *Miranda,* 384 U.S. at 436, 86 S.Ct. at 1602. As a matter of fact, the Supreme Court has gone considerably farther than the state trial judge did here. In *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), the petitioner was questioned by a probation officer and confessed to a crime and that testimony was not prohibited by *Miranda.* In this case, the petitioner voluntarily sought to talk to someone, that person being one Kenneth Hood. The petitioner initiated the conversation and that finding of fact was made explicitly by the Supreme Court of Indiana in 451 N.E.2d at 1061. Such finding of fact is presumed to be correct under 28 U.S.C. § 2254(d), but this court has made an independent examination of the record in that regard under *Miller v. Fenton,* 474 U.S. at 104, 106 S.Ct. at 446, and is in complete agreement with the aforesaid finding by the Supreme Court of Indiana in this regard.

In this case, that officer was merely listening to a voluntary statement initiated by the petitioner and *Miranda* was not violated. This is not an example of state-sponsored interrogation. In this instance, the voluntariness of the statement was clearly established under the mandates of *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

■ An attack is made upon the verdict forms that were submitted. The jury was given a one-page form containing three paragraphs of possible verdicts and a blank space for the date and foreperson's signature under each paragraph. The jury considered the following language:

We, the jury, find the defendant not guilty.

We, the jury, find the defendant guilty of Murder while the said Thomas N. Schiro was committing and attempting the crime of rape as charged in Count II of the information.

We, the Jury, find the defendant guilty while the said Thomas N. Schiro was committing and attempting to commit

the crime of criminal deviate conduct as charged in Count III of the information. It is extremely doubtful that this rises to the level of a constitutional challenge. The jury was told that there could be a finding of guilty but mentally ill and that that applied to all three theories of murder. The instructions and verdict forms must be examined as a whole to determine whether they pass constitutional muster. *See California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). It is important to note that this issue was not raised prior to the retirement of the jury.

■ An effort is made to challenge the original charging information in a state court as being unverified. A facial examination clearly shows that it was indeed verified. The initial information dated and filed February 10, 1980, has been examined here. On April 9, 1981, there were requests for the death penalty filed by the Chief Deputy Prosecutor of Vanderburgh County, Indiana. That issue was never raised in the state courts and has been raised here for the first time. In *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), *rehr'g denied,* 490 U.S. 1031, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989). Justice O'Connor stated:

> A rule announced in *Harris v. Reed* [489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)], assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding. It is simply inapplicable in a case such as this one where the claim was *never* presented to the state courts. (emphasis added) 489 U.S. at 299 [109 S.Ct. at 1068–69]

It does not appear that the other concurring judges in *Teague,* 489 U.S. at 288, 109 S.Ct. at 1060 are at odds with the above quoted statement of Justice O'Connor. Their focus was primarily on the problem of retroactivity of the rule established in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Therefore, it seems clear that when *Teague,* 489 U.S. at 288, 109 S.Ct. at 1060, and *Harris,* 489 U.S. 255, 109 S.Ct. 1038, are considered in tandem issues that were never raised in the

state courts are the proper subject of procedural default in this collateral review under § 2254. Were it to be otherwise, there could never be an end to this kind of collateral review. If a defendant convicted in a state court proceeding could file continuous assertions of issues and claims not previously raised in the state courts, and then claim the benefits of *Harris,* it would be very difficult if not impossible, to ever bring a § 2254 proceeding to an end. *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963) might provide a cutoff in such cases. *See also Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986). Certainly, this is a subject that has caught the attention of a special committee chaired by retired Justice Lewis F. Powell and a legislative solution to this kind of problem which pending in the Congress of the United States. However, under *existing* law, it appears that issues have not been raised in the state courts can and should be procedurally defaulted under the above analysis of *Harris v. Reed,* and *Teague v. Lane.*

Another effort is made to challenge whether *mens rea* was alleged in the charging information or is required by the relevant Indiana statute. Such issue does not appear to have been raised in any way in the state courts and under the above reasoning in *Harris* and *Teague,* cannot be presented here for the first time. It is subject to procedural default. There can be no question, however, that *mens rea* was an element of the crimes charged and that there was more than enough proof of its existence in the record in this case. Whatever conceptual merit this argument might have, it does not rise to a constitutional level in this case. *See Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

There is a charge that there is some variety of a due process violation, possibly a double jeopardy one, in that three Counts of murder with three allegedly different theories were charged when there was only one killing and one victim. This issue was never raised in the state courts and is raised for the first time here and is subject to procedural default under the above

analysis of *Harris v. Reed* and *Teague v. Lane.* In any event, there was a finding of guilty *only* on Count II.

■ An issue under the Fourth Amendment with reference to a search warrant is raised. It is alleged that the affidavit to obtain the warrant, the return of the warrant and the items seized under the warrant were improperly allowed into evidence. It is alleged that the person who issued the warrant was not a neutral and detached magistrate. It is further alleged that in part, the warrant was based on information provided by Kenneth Hood, above referred to, which was obtained in violation of the *Miranda* rule. Since there was no *Miranda* violation in that regard, that part of the argument here fails.

It appears that the Fourth Amendment issue in this regard was fully and fairly litigated in the state courts under the mandates of *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Once that decision is made, it is not to be litigated here. *See also Willard v. Pearson*, 823 F.2d 1141 (7th Cir.1987); *Wallace v. Duckworth*, 778 F.2d 1215 (7th Cir.1985).

On the first direct appeal, this issue is dealt with at 451 N.E.2d at 1061. Even aside from *Stone*, 428 U.S. at 465, 96 S.Ct. at 3038, the decisions of the Supreme Court of the United States in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), *Illinois v. Krull*, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) would authorize the issuance of a search warrant. Although it is doubtful if it is necessary to go to *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), for salvation in this regard, certainly it also would provide a constitutional basis for the admission of the fruits of this search warrant.

There is some argument made that this issue was not fully and fairly presented to the state courts in the first instance under *Castille v. Peoples*, 489 U.S. 346, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and *Cruz v. Warden of Dwight Correctional Center*, 907 F.2d 665 (7th Cir.1990). The court chooses not to bottom its decision in this regard on that concept, but rather bottoms

it on the *Stone*, 428 U.S. at 465, 96 S.Ct. at 3038, concept.

■ The next issue raised has to do with refusal of the state trial court to admit a letter allegedly written by the petitioner, but not admitted into evidence because of the failure to have the letter properly authenticated. This issue was presented to the Supreme Court of Indiana on direct appeal and resolved there at 451 N.E.2d at 1061 and 1062. It is highly doubtful if it raises a constitutional issue. At most it presents an issue of the state law of evidence which should not be interfered with by the federal judiciary on collateral review. It cannot be shown that its exclusion undermines the basic and fundamental fairness of these proceedings.

■ Another issue is raised here for the first time regarding the modification of a certain instruction tendered by the petitioner. Again, this issue is foreclosed by the aforesaid reasoning in *Harris*, and *Teague*. In this regard, the defendant/petitioner tendered his instruction 15 which stated:

> The Defendant, Thomas Schiro, has not taken the witness stand as a witness. His failure to do so shall not, in any manner, be considered by you in arriving at your verdict, nor should you consider his appearance and demeanor in the courtroom during trial in arriving at your verdict.

In giving this instruction, the trial court struck therefrom "nor should you consider his appearance and demeanor in the courtroom during trial in arriving at your verdict." No authority is cited by this petitioner to demonstrate any errors here. Any error is not of the constitutional variety.

■ At trial, the state presented a rebuttal witness in the testimony of Linda Summerfield, sometimes called Linda Summerford. She allegedly was raped by the petitioner and recognized his picture as her attacker in the newspapers. A photographic lineup was conducted and she picked out Schiro's picture in that display. There is a question here as to the Fourteenth Amendment duty to disclose exculpatory evidence

under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *See also United States v. Jackson,* 780 F.2d 1305 (7th Cir.1986); *Palmer v. City of Chicago,* 755 F.2d 560 (7th Cir.1985); *United States v. Fairman,* 769 F.2d 386 (7th Cir.1985); and *Carey v. Duckworth,* 738 F.2d 875 (7th Cir.1983). However, it does not appear to this court that this evidence is *ex* culpatory. In fact, it was very much *in* culpatory. It should be noted that this is not a case in which the alibi defense was imposed as was the case in *Mauricio v. Duckworth,* 840 F.2d 454 (7th Cir.1987) *cert. denied,* 488 U.S. 869, 109 S.Ct. 177, 102 L.Ed.2d 146 (1988). Neither is the concept of reciprocal discovery in the alibi context of *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) applicable. Any earlier non-disclosure of the existence of the testimony of Linda Summerfield (Summerford) violated none of the due process rights of this petitioner. This court chooses not to bottom its decision in this regard on procedural default, since there was some reference to it in the state record. The petitioner apparently in an effort to have the jury conclude that he was mentally deranged, admitted to 23 sexual attacks of which the incident with Linda Summerfield (Summerford) was only one. In any event, the due process clause was not violated. Even assuming the existence of some error in failing to disclose this rebuttal witness, the same is harmless beyond a reasonable doubt.

■ Constitutional errors in a criminal trial are grounds for reversal unless they are "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The petitioner is entitled to a fair trial not a perfect one. *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). *See also Sulie v. Duckworth,* 864 F.2d 1348, 1356 (7th Cir. 1988); *Ortega v. O'Leary,* 843 F.2d 258, 262 (7th Cir.1988), *cert. denied,* 488 U.S. 841, 109 S.Ct. 110, 102 L.Ed.2d 85 (1988). The harmless error rule "promotes public respect for the criminal process by focus-ing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436. *See also United States ex rel. Thomas v. O'Leary,* 856 F.2d 1011, 1017 (7th Cir.1988).

■ The initial inquiry for the court then "is whether absent the constitutionally-forbidden evidence, honest and fair-minded jurors might very well have brought in not-guilty verdicts." *Burns v. Clusen,* 798 F.2d 931, 943 (7th Cir.1986) (citing *Chapman v. California,* 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967)). The court must determine " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *United States ex rel. Ross v. Fike,* 534 F.2d 731, 734 (7th Cir. 1976) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). This circuit generally requires other evidence of guilt to be "overwhelming" before concluding a constitutional error was harmless. *See Sulie,* 864 F.2d at 1359; *Smith v. Fairman,* 862 F.2d 630, 639 (7th Cir.1988), *cert. denied,* 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989); *United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1020 (7th Cir.1987); *Burns,* 798 F.2d at 943; *United States v. Shue,* 766 F.2d 1122, 1133 (7th Cir.1985). But in making this determination the court is not to engage in a reweighing of the evidence to determine the impact on the jury's verdict. *Fencl v. Abrahamson,* 841 F.2d 760, 769 (7th Cir.1988). Rather, the court must examine all the evidence to determine the impact of the objectionable evidence on the jury's verdict. *Id. See also United States v. de Ortiz,* 883 F.2d 515 (7th Cir.1989); and *United States v. Cheek,* 882 F.2d 1263 (7th Cir.1989).

■ There is also a constitutional issue raised with regard to the sequestration of the jury and the admonitions with reference to media accounts. It should be remembered that this case was tried in Nashville, Indiana, in one of the smallest and least populated counties in the State of Indiana, a town with a weekly newspaper

and no local radio or television station. The record in this case in regard to any possible prejudicial publicity is light years away from *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), and *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). This issue was raised primarily under the guise of ineffective assistance of counsel and was dealt with in the third opinion by the Supreme Court of Indiana at 533 N.E.2d 1201 et seq. It must be examined under the mandates of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *United States v. Grizales*, 859 F.2d 442, 447 (7th Cir.1988), Judge Eschbach, speaking for the court stated:

> The Supreme Court has instructed that in evaluating the performance of a trial attorney we are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2054. Appellant "has a heavy burden in proving a claim of ineffectiveness of counsel." *Jarrett v. United States*, 822 F.2d 1438, 1441 (7th Cir.1987) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064). The Supreme Court has further cautioned appellate courts to resist the temptation to "second-guess" the actions of trial counsel after conviction. *Id.* It is clear that the performance of trial counsel should not be deemed constitutionally deficient merely because of a tactical decision made at trial that in hindsight appears not to have been the wisest choice. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Kennedy*, 797 F.2d 540, 543 (7th Cir.1986).

*See also United States v. Adamo*, 882 F.2d 1218 (7th Cir.1989). There is no showing that any juror was exposed to media coverage during trial. The Supreme Court of Indiana expressly made that finding at 533 N.E.2d at 1206. That finding, while presumptively correct, is also supported on the basis of an independent examination of the record under *Miller v. Fenton*, 474 U.S. at 104, 106 S.Ct. at 446. *See Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1984).

The burdens on a trial judge in a death penalty case are enormous. The appellate courts and the federal reviewing courts should not engage in second-guessing about how to best manage this awfully difficult judicial event. Each locale and each case has its own life and set of circumstances. There is nothing in this record to indicate that Judge Samuel Rosen violated the Constitution of the United States in his management, including lack of sequestration of this jury, during this trial. Most seasoned trial judges avoid sequestration of juries like the plague. Such is fraught with both personal and judicial problems. It is only when the factual record demonstrates that nothing short of sequestration will suffice should a reviewing court find a constitutional error. No basis to compel sequestration is to be found in this record.

██ An issue is raised with reference to the claim that the state trial court failed to give this indigent petitioner expert psychiatric assistance. Even assuming that this somehow raises a constitutional right, this petitioner did have psychiatric assistance in the preparation of his defense in the person of Dr. Frank Osanka. The testimony challenging the credibility of Dr. Osanka was that of the petitioner himself. That testimony was specifically found to be incredible by the state trial judge who heard him. *See Schiro*, 533 N.E.2d at 1207. Assuming the best of this for this petitioner, his constitutional rights were not violated in that regard. There were two independent court-appointed psychiatrists who evaluated this petitioner as to both his competency to stand trial and his sanity at the time of the trial. Those psychiatrists did not conclude that the petitioner was insane but certainly the Constitution of the United States does not guarantee to a defendant charged with a serious death penalty crime the right to have a psychiatrist who will claim that he is insane. The mere statement of that proposition indicates its utter absurdity.

It should also be noted that the appointment of two independent court-appointed psychiatrists meets the constitutional de-

mands of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

■ Much is made of the so-called rocking/non-rocking situation. That brief factual slice of the record probably has gotten considerably more attention than it deserves. Manipulation is not a basis in Indiana for imposing a sentence of death and was not used and the Supreme Court of Indiana specifically found that it was not used in this case. *See* 479 N.E.2d at page 559. The Supreme Court of the United States has said in a general way that a sentence may be enhanced if the sentencing trial judge believes that the defendant's testimony was perjured. *See United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). However, when a sentencing judge does enhance a sentence for that reason, a defendant is not generally entitled to a hearing on that issue. *See United States v. Bortnovsky*, 879 F.2d 30, 43 (2nd Cir.1989).

There is a right to have a sentence based on reliable and accurate information. *See Tucker v. United States*, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972). *See also United States v. Harris*, 558 F.2d 366 (7th Cir.1977).

■ One of the issues raised post-conviction and here is that Judge Samuel Rosen exhibited bias and prejudice against this particular petitioner because of an alleged ex parte and post-trial statement that "the boy is going to fry." Certainly, there is a longstanding right to an impartial judge, as defined by Chief Justice Taft more than 60 years ago in *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). In this regard, that court stated:

All questions of judicial qualification may not involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion. *Wheeling v. Black*, 25 W.Va. 266, 270. But it certainly violates the Fourteenth Amendment, and deprives a defendant in a criminal case of due process of law, to subject his liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in this case.

No such problem exists in this case. What is involved here is reactions of this state trial judge after the fact rather than before the fact. Criminal trials that are envisioned under the Sixth Amendment of the Constitution of the United States are enormously human events. Judges who preside over such criminal trials which involve the grossest kind of violence that is rested by one human being on another are not required to put their potential for moral indignation on the back shelf. When a defendant is charged with a serious crime, regardless of how grotesque the charge may be and how heinous the conduct of that defendant may be, it is the sworn task of a presiding trial judge to comply as evenhandedly as possible with the mandates of the due process clause in following the law and the basic concepts of fairness that inhere. It would certainly be a sad day for either the state or federal judiciary if judges were required to be or become valueless and morally neutral. It would also be a sad day for the state and federal judiciary if a veteran trial judge somehow through the process of experience became immune to normal feelings of moral indignation at heinous and violent criminal conduct.

The record in this case most certainly justified these private feelings of moral indignation by this veteran state court judge. However, Judge Rosen erred, although not in a constitutional sense. In a case tried by this Judge, *United States v. Murzyn*, 631 F.2d 525 (7th Cir.1980), an issue was raised with regard to a comment that this Judge made in the course of that trial. Chief Judge Bauer (then Judge) of the United States Court of Appeals suggested at page 535 that the comment would have been better left unsaid. Nonetheless, the verdict of guilty in *Murzyn* was upheld on appeal, and that bit of judicial conduct did not create a constitutional defect.

Understanding the cultural environment that pervades places like Nashville, Indiana, apparently Judge Rosen made a

gratuitous ex parte out-of-court comment to a newspaper reporter and the deputy prosecuting attorney. The post-conviction state judge heard testimony from Judge Rosen, the newspaper reporter and the deputy prosecuting attorney in regard to this incident. Based on that testimony, that post-conviction relief state judge made a specific finding of fact that there was no bias or prejudice by Judge Rosen. That decision was upheld by the Supreme Court of Indiana. However, this does not excuse the fact that state trial judges who preside over cases in which the death penalty is or may be imposed have enormously delicate responsibilities. Speaking ex parte after the fact to a newspaper reporter or a deputy prosecutor does not serve that proper judicial function. This court has examined this slice of the record with the greatest of care and delicacy and is convinced that there is very substantial support for the conclusion of the state courts in this regard and is convinced that there was no violation of the constitutional right as defined in *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437. The facts in *Tumey* are a far cry from those here.

█ The petitioner was found guilty of the charge in Count II. Somehow it is now attempted to extrapolate the fact that there was no finding of guilty under Count I of the information into a finding that there was no intentional killing and therefore the death penalty is not appropriate. In order to get to that result, a number of large jumps in logic and fact are necessary. The facts are that the petitioner was found guilty in Count II. The jury did not fill out a verdict form on Counts I or Count III. Somehow this becomes a double jeopardy claim. This petitioner was not acquitted by Counts I or III and neither was he found guilty. He was found guilty on Count II.

█ It is a constitutional condition precedent to an application of the double jeopardy clause of the Fifth Amendment of the Constitution that there be an acquittal. Whether there is an acquittal depends largely on state law. *See Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). *See also United States ex rel. Young v. Lane*, 768 F.2d 834 (7th Cir.1985), *cert. denied*, 474 U.S. 951, 106 S.Ct. 317, 88 L.Ed.2d 300 (1985). The Supreme Court of Indiana in the first direct appeal stated that the jury's recommendation was "an intermediate step" in the process toward the court's final judgment. *See* 451 N.E.2d at page 1056. There is an analogy, although not a perfect one, between this situation and inconsistent verdicts. *See United States v. Reed*, 875 F.2d 107 (7th Cir.1989). There is simply no constitutional merit to the argument that somehow the failure of the jurors to render any decision on Counts I and III some way or other constitutes an acquittal which extrapolates into a double jeopardy argument that frees this defendant petitioner.

When it is all said and done, the judge of the Brown Circuit Court engaged in a fully constitutionally adequate sentencing procedure that has been fully and carefully explained on the record and in writing. It does not suffer from any constitutional deficiencies which causes this court to set it aside on collateral review. This case has now been to the Supreme Court of Indiana three times. While there are justices on that court who have expressed concerns, the majority of that court in each instance has declined to undermine this sentence of death. That court's recent history indicates that it is perfectly capable of reversing a death sentence. *See Smith v. Indiana*, 547 N.E.2d 817 (Ind.1989); *Cooper v. Indiana*, 540 N.E.2d 1216 (Ind.1989); and *Martinez Chavez v. State*, 534 N.E.2d 731 (Ind.1989). It is also very clear that Justices of the present Supreme Court of Indiana are more than capable of rendering individualized judgment in criminal death penalty cases. The record here is evidence of that kind of review. The Supreme Court of the United States has denied certiorari in this case three times. This court would especially note the statement of Justice Stevens in *Schiro v. State*, —— U.S. ——, 110 S.Ct. 268, 107 L.Ed.2d 218 (1989). With the greatest respect for Justice John Paul Stevens, it is the fervent hope of this court that the issues about which he expressed concern have been dealt with here in the fashion that he suggested.

An issue is raised with regard to the effective assistance of counsel under *Strickland,* 466 U.S. at 668, 104 S.Ct. at 2054, which requires both unprofessional conduct and actual prejudice. *See United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1013–14 (7th Cir.1987). That issue was thoroughly examined in the third opinion of the Supreme Court of Indiana at 533 N.E.2d at 1207. While this court cannot rely on the correctness of the legal judgment in that regard, it can presume as correct the historical facts under 28 U.S.C. § 2254(d). However, under *Miller v. Fenton,* 474 U.S. at 104, 106 S.Ct. at 446, this court has made an independent examination of the record in this regard and finds the various attempts to nitpick after the fact the conduct of defense counsel to be little more than that. This defense counsel was confronted with a most difficult situation and did a job which met Sixth Amendment professional standards.

■■■■■ There is a charge that this defense counsel failed to submit mitigating evidence during a sentencing hearing, relying on *Dillon v. Duckworth,* 751 F.2d 895 (7th Cir.1985), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985). In *Dillon,* there was no insanity defense and the assertion of such a defense opens a very wide door with regard to the character and history of a defendant. During the guilt phase of the trial, the personal history of the defendant was brought forward, including testimony by his father. Defense counsel argued the mitigating factors to the jury and to the judge at sentencing. A defendant has a right to effective assistance of counsel at sentencing. *See Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). However, strategic decisions are accorded substantial deference. *See Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). There is a presumption that effective assistance of counsel is rendered until the contrary is shown and the burden is on the petitioner to do so. *See Santos v. Kolb,* 880 F.2d 941, 943 (7th Cir.1989). Certainly, a defense counsel is not required to present mitigating evidence when none exists. *See Smith v. Dugger,* 840 F.2d 787, 795 (11th Cir.1988). *United States v. Myers,* 917 F.2d 1008 (7th Cir.1990). It is further alleged that somehow the prosecution coerced Mary Lee into testifying and there was a failure to disclose so-called exculpatory evidence in this regard. This was raised as a claim of ineffective assistance of counsel in the state courts where it was claimed that the petitioner told his counsel that the state had threatened to take away Lee's child if she did not cooperate, but that the attorney did nothing about it. This claim appears to be at odds with the one made in the state court. Either the petitioner and his counsel knew about Mary Lee and it was therefore undisclosed, or they did not know and it should have been disclosed. Apparently, they can't have it both ways. In any event, there was no prejudice to the petitioner by the testimony of Mary Lee, some of which was indeed favorable to him. Testimony was also cumulative with reference to the testimony of the court-appointed psychiatrist. Certainly, her testimony did not change the outcome in this trial in favor of the petitioner. The record in this case, however, fails to disclose any coercion. In fact, the Supreme Court of Indiana found to the contrary at 533 N.E.2d page 1206. While that historical fact is presumptively correct under Title 28 U.S.C. § 2254(d), an independent examination of the record under *Miller v. Fenton,* 474 U.S. at 104, 106 S.Ct. at 446 discloses that it is correct in any event.

■■■■■ Last of all, there is an attempt to make an issue with regard to the handcuffing and shackling of the petitioner outside the courtroom during breaks in court proceedings and going to and from the courthouse. There is no evidence in the record that any juror saw the petitioner in that condition. In another case, *Osborne v. Duckworth,* 567 F.Supp. 427 (N.D.Ind. 1983), this court was very concerned about an incident in the Adams County Courthouse in Decatur, Indiana, and granted a habeas corpus petition under 28 U.S.C. § 2254 because of it. That decision was reversed in an unpublished opinion by the Court of Appeals. *See* 757 F.2d 1292 (7th Cir.1985).

Finally, the prosecuting authorities have a substantial interest in seeing that a defendant on trial for a capital case remains in custody and does not escape from a small, rural courthouse and the adjacent jail. *See Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986). *See also Clark v. Wood,* 823 F.2d 1241, 1245 (8th Cir.1987), *cert. denied,* 484 U.S. 945, 108 S.Ct. 334, 98 L.Ed.2d 361 (1987).

It should be noted that counsel's memorandum filed on September 4, 1990, on behalf of the petitioner deals exclusively with the question of intentionality. Although of some constitutional dimension, counsel's memorandum contains more of a question of complying in rather straightforward criminal law terms with the requirements of the Indiana death penalty statute. Petitioner asserts that Judge Rosen did not make a specific finding of fact of an intentional killing. The Supreme Court of Indiana ruled in *Fleenor v. State,* 514 N.E.2d 80 (Ind.1987), that Indiana's death penalty statute survives a constitutional challenge because it requires a finding of specific intent.

The first time the Supreme Court of Indiana reviewed the petitioner's case on direct appeal, it found that, "with the submission of the *nunc pro tunc* entry the trial court properly followed the required procedures in imposing the death sentence. The record justifies the finding of the aggravating circumstances that Thomas Schiro intentionally killed Laura Luebbehusen." *Schiro v. State,* 451 N.E.2d 1047, 1059 (Ind. 1983). This issue was held to be *res judicata* on petitioner's third post-conviction review. *Schiro v. State,* 533 N.E.2d 1201 (Ind.1989).

 This court agrees with the Supreme Court of Indiana's determination that Indiana's death penalty statute is constitutional and that Judge Rosen complied with it in sentencing Thomas Schiro.

I.C. § 35–50–2–9 states:

a) The state may seek a death sentence for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one of the aggravating circumstances listed in sub-section (b). In the sentencing hearing after a person is convicted of murder, the state must prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances alleged.

b) The aggravating circumstances are as follows:

 1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

It is apparent that Justice Stevens and Justice DeBruler are judicially squeamish about the procedure under Indiana law, whereby a sentencing trial judge may impose a death sentence even after a jury has made a contrary recommendation. As a matter of federalism, the General Assembly of the State of Indiana has the option to enact such a procedure which on its face does not violate the due process clause of the Fourteenth Amendment, the Sixth Amendment, or the Eighth Amendment of the Constitution of the United States. Given the basics of federalism, this court should not disturb that state established procedure. *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

 With that procedural process established, the factual record must clearly support the imposition of the death penalty. The sentencing trial judge should not ignore the recommendation of the jury. However, that sentencing authority is fixed in that judge and not in the jury. The realities of the situation are that the sentencing judge faces a more rigorous standard in imposing the death penalty in the face of a contrary jury recommendation. The factual record must clearly justify the death sentence and the reasons given by the sentencing judge must be appropriate ones. The primary focus must be on the factual record as the foundation for the reasons stated. The values involved are far too important to become immersed in minor formalities. The Supreme Court of Indiana simply wanted from the sentencing trial judge a more complete statement of reasons for the imposition of the death

penalty and it got same. Such procedure did not invoke the double jeopardy clause of the Fifth Amendment of the Constitution of the United States.

The reasons given for the imposition of the death penalty by the sentencing trial judge, both orally and in writing, have been fully set forth here. Those reasons spring from the factual record, are clearly reflected therein, and meet the constitutional standards currently applied by the Supreme Court of the United States in comparable cases.

It is a part of the *state* law of this case that the non-action of the jury on Counts I and III does not constitute an acquittal. It is not here necessary to write a constitutional treatise on the double jeopardy clause based on a hypothetical that some effort is being made to again try this petitioner on Counts I and III because that situation does not confront this court. In the reality of criminal prosecutions, it is commonplace for multiple and indeed alternative criminal charges to be submitted to a jury and for the jury to return a verdict on less than all of the charges submitted. It is not necessary for this court to determine whether there is perfect symmetry in the case law of Indiana in this subject area. In *this* case, *this* jury found *this* petitioner guilty of Count II and did not act on Counts I and III. The death penalty was imposed on Count II. There is nothing in the Fourteenth or Fifth Amendment of the Constitution of the United States that *compels* this court to label that non-action on Counts I and III as an acquittal for Fifth Amendment double jeopardy purposes. The Supreme Court of Indiana, with Justice DeBruler dissenting, did not so label it and a decent respect for the basic concepts of federalism does not compel this court to do otherwise.

Justice Stevens quotes Justice Powell, now retired, in stating that special and careful attention is required in regard to the consideration of death penalty cases. This court is in total agreement. No one can argue with those suggestions. The record in this case certainly reflects nearly a decade of state and federal court actions and reviews. More of the same will follow this decision. Notwithstanding the demands for special and careful review, this court must apply to the best of its ability and knowledge contemporarily established constitutional standards under the Eighth Amendment of the Constitution of the United States in its collateral review under 28 U.S.C. § 2254. With all deference and respect, it is the view here that such has been done.

In all of this review, it must be remembered that it was this veteran state trial judge who presided over all of the trial court proceedings resulting in the determination of guilt and it was he and not the reviewing appellate court and not this court, who saw all of the witnesses, heard and dealt with this case literally in all of its flesh and blood dimensions. In the precise areas of credibility determinations, the same should rest primarily and fundamentally with him and not with the reviewing courts, except upon a determination of a constitutional error.

There is no *constitutional* basis to disturb the imposition of the death penalty by this state trial judge in this case under 28 U.S.C. § 2254. Therefore, the writ must be DENIED. IT IS SO ORDERED.

## APPENDIX A

### 35–50–2–9 Death sentence

Sec. 9. (a) The state may seek a death sentence for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one (1) of the aggravating circumstances listed in subsection (b). In the sentencing hearing after a person is convicted of murder, the state must prove beyond a reasonable doubt the existence of at least one (1) of the aggravating circumstances alleged.

(b) The aggravating circumstances are as follows:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit any of the following:

(A) Arson (IC 35–43–1–1).

(B) Burglary (IC 35–43–2–1).

(C) Child molesting (IC 35–42–4–3).

(D) Criminal deviate conduct (IC 35–42–4–2).

(E) Kidnapping (IC 35–42–3–2).

(F) Rape (IC 35–42–4–1).

(G) Robbery (IC 35–42–5–1).

(H) Dealing in cocaine or a narcotic drug (IC 35–48–4–1).

(2) The defendant committed the murder by the unlawful detonation of an explosive with intent to injure person or damage property.

(3) The defendant committed the murder by lying in wait.

(4) The defendant who committed the murder was hired to kill.

(5) The defendant committed the murder by hiring another person to kill.

(6) The victim of the murder was a corrections employee, fireman, judge, or law enforcement officer, and either:

(A) the victim was acting in the course of duty; or

(B) the murder was motivated by an act the victim performed while acting in the course of duty.

(7) The defendant has been convicted of another murder.

(8) The defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other murder.

(9) The defendant was:

(A) under the custody of the department of correction;

(B) under the custody of a county sheriff;

(C) on probation after receiving a sentence for the commission of a felony; or

(D) on parole;

at the time the murder was committed.

(10) The defendant dismembered the victim.

(11) The victim of the murder was less than twelve (12) years of age.

(12) The victim was a victim of any of the following offenses for which the defendant was convicted:

(A) Battery as a Class D felony or as a Class C felony under IC 35–42–2–1.

(B) Kidnapping (IC 35–42–3–2).

(C) Criminal confinement (IC 35–42–3–3).

(D) A sex crime under IC 35–42–4.

(c) The mitigating circumstances that may be considered under this section are as follows:

(1) The defendant has no significant history of prior criminal conduct.

(2) The defendant was under the influence of extreme mental or emotional disturbance when the murder was committed.

(3) The victim was a participant in, or consented to, the defendant's conduct.

(4) The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.

(5) The defendant acted under the substantial domination of another person.

(6) The defendant's capacity to appreciate the criminality of the defendant's conduct or to conform that conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.

(7) The defendant was less than eighteen (18) years of age at the time the murder was committed.

(8) Any other circumstances appropriate for consideration.

(d) If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing. If the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing. The jury or the court may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing. The defendant may present any additional evidence relevant to:

(1) the aggravating circumstances alleged; or

(2) any of the mitigating circumstances listed in subsection (c).

(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds:

(1) that the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances exists; and

(2) that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation.

(f) If a jury is unable to agree on a sentence recommendation after reasonable deliberations, the court shall discharge the jury and proceed as if the hearing had been to the court alone.

(g) If the hearing is to the court alone, the court shall sentence the defendant to death only if it finds:

(1) that the state has proved beyond a reasonable doubt that at least one (1) of the aggravating circumstances exists; and

(2) that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

(h) A death sentence is subject to automatic review by the supreme court. The review, which shall be heard under rules adopted by the supreme court, shall be given priority over all other cases. The death sentence may not be executed until the supreme court has completed its review. *As amended by P.L. 332–1987, SEC. 2; P.L. 320–1987, SEC. 2; P.L. 296–1989, SEC. 2; P.L. 138–1989, SEC. 6; P.L. 1–1990, SEC. 354.*